**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian (SBN: 249203)
ak@kazlg.com
Gil Melili (SBN: 337116)
245 Fischer Ave., Suite D1
Costa Mesa, CA 92626
Phone: (800) 400-6808
Facsimile: (800) 520-5523

**KAZEROUNI LAW GROUP, APC**
Jason A. Ibey (SBN: 284607)
jason@kazlg.com
321 N Mall Drive, Suite R108
St. George, Utah 84790
Phone: (800) 400-6808
Facsimile: (800) 520-5523

[Additional Counsel On Signature Page]

*Attorneys for Plaintiff,*
Gilbert Amis

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **GILBERT AMIS, Individually and On Behalf of All Others Similarly Situated,**<br><br>    **Plaintiff,**<br><br>    **vs.**<br><br>**NETSPEND CORPORATION; and METABANK, N.A. N/K/A PATHWARD, N.A.,**<br><br>    **Defendants.** | Case No.: 2:22-cv-06598-FMO-GJS<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:**<br><br>**1. VIOLATIONS OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT, CAL. CIV. CODE § 1780, *ET. SEQ.*;**<br><br>**2. VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE § 17200, *ET. SEQ.*;**<br><br>**3. UNJUST ENRICHMENT.**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff GILBERT AMIS ("Plaintiff"), individually and on behalf of all others similarly situated, brings this lawsuit against Netspend Corporation ("Netspend") and Metabank, N.A. n/k/a Pathward, N.A. ("Metabank") (jointly, "Defendants") (collectively, the "Parties"), and allege as follows:

## I.    INTRODUCTION

1.   Netspend sells prepaid debit cards, including general purpose reloadable cards such as its Visa® Prepaid Card (hereinafter, "Netspend Cards"). Consumers can load cash on the cards at retail locations and even have their paychecks, government benefits, and tax refunds deposited directly onto Netspend Cards. Netspend Cards operate on the Visa or MasterCard network, and consumers can use them as they would a Visa or MasterCard debit card to make purchases, withdraw cash from ATMs, and pay bills, among other things.

2.   Netspend markets the Netspend Cards to consumers nationwide on their website and in several retail stores. Netspend also partners with large businesses that have nationwide distribution, such as "Walmart, PayPal, Western Union, H-E-B, Brinks, Major League Baseball and United Airlines[,]" serving approximately "10 million customers throughout the United States."[1] Netspend "has established more than 120,000 card distribution sites and 130,000 card reload locations."[2]

3.   Sadly, Netspend has a history of denying consumers access to funds loaded onto their Netspend Cards. The Federal Trade Commission ("FTC"), having received several consumer complaints regarding Netspend's conduct, filed a lawsuit against Netspend for similarly alleged conduct as recently as 2016, resulting in a more than $10 million settlement in 2017 affecting approximately 430,000

---

[1]    https://www.netspend.com/about/press-room/netspend-celebrates-20-years-of-service-to-customers-through-its-trusted-payment-solutions#:~:text=Netspend%20now%20generates%20%24800%20million,and%20130%2C000%20card%20reload%20locations. (last accessed Aug. 23, 2022).
[2] *Ibid.*

consumers.

4. For example, the FTC noted complaints concerning consumer being unable to access their funds that were loaded into the reloadable pre-paid cards, either because Netspend denies or delays activation of the cards, or because consumers were blocked from using the funds on the cards.

5. Nevertheless, approximately six (6) years after the FTC's settlement, Netspend customers continue making numerous complaints about their inability to access funds on their Netspend Cards. Consumers continue to report experiencing significant delays in attempting to activate Netspend Cards after loading funds onto them, leaving consumers without access to their money.[3] In other instances, Netspend denied consumers access to their Netspend Cards even after the cards were activated. And in other cases, such as this one, Netspend Cards that were loaded with a particular amount ended up with a lesser amount after activation.[4]

6. Netspend is aware of the consumer complaints because Netspend has responded to many of the complaints on the Better Business Bureau's website as well as by mail, email, and or telephonic communications.

7. Despite being aware of consumer complaints regarding the Netspend Card, Netspend continues to engage in unfair, unlawful, and fraudulent practices by advertising to consumers that they can "easily keep track of every dime" on their Netspend Card accounts and that they can "[m]ake life more convenient" by getting their "money into [their] Netspend account quickly, without lifting a finger[,]"[5] even though that is not the case.

8. Plaintiff alleges the following upon personal knowledge as to Plaintiff and

---

[3]https://www.bbb.org/us/tx/austin/profile/prepaid-debit-cards/netspend-corporation-0825-53229/complaints (last accessed July 29, 2022).
[4]https://www.bbb.org/us/tx/austin/profile/prepaid-debit-cards/netspend-corporation-0825-53229/complaints (last accessed Aug. 23, 2022).
[5] https://www.netspend.com/prepaid-debit/how-it-works (last accessed Aug. 23, 2022).

Plaintiff's own experiences and, as to all other matters, upon information and belief including due investigation conducted by his attorneys.

## II.    PARTIES

9.  Plaintiff GILBERT AMIS is, and at all times mentioned herein, was a natural person residing in the County of Los Angeles, in the State of California.

10. Defendant Netspend is a Delaware corporation with its principal place of business in Austin, Texas. As of approximately the date of this complaint, Netspend is licensed to do business in the State of California and regularly conducts business in Los Angeles County, including partnerships with national businesses and banks that sell Netspend debit cards in Los Angeles County.

11. Metabank, also known as Pathward, N.A., is the issuer of the Netspend Cards that were purchased by GILBERT AMIS and members of the Classes. Upon information and belief, funds loaded onto Netspend Cards are held at or transferred to MetaBank.

12. Defendant Metabank has its principal place of business in Sioux Falls, South Dakota, as a national association, is considered to be a citizen of South Dakota. *See e.g., Rouse v. Wachovia Mort., FSB*, 747 F.3d 707, 709 (9th Cir. 2014) (holding that Wells Fargo "is a citizen only of South Dakota" because a national bank is a citizen "only of the state in which its main office is located"); *accord Martin v. Wells Fargo Bank, N.A.*, No. 20-16365, 2022 U.S. App. LEXIS 23635, at *2 (9th Cir. Aug. 23, 2022). Metabank provides commercial banking services nationwide, including in California.

## III.    JURISDICTION AND VENUE

13. This Court has original jurisdiction over this matter pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one defendant, there are 100 or more Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

14. The amount in controversy under CAFA is satisfied because (i) there are over fifty (50) locations within California where consumers may purchase a Netspend Card; (ii) there are more than 130,000 reload locations within the United States where consumers may add money to their Netspend Cards; (iii) in 2019, Netspend reported serving approximately 10 million consumers in the United States, alone; (iv) upon information and belief, there are over 10,000 Class Members within California alone; (v) in 2018, the FTC sent settlement payments to more than 430,000 individuals within the United States due to Netspend's similar misconduct with a settlement of more than $10,00,000; and (vi) in addition to seeking actual damages for Netspend card that did not have the proper balances, Plaintiff seeks changes to Defendants' practice.

15. Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b)(2) and 18 U.S.C. § 1965(a), because a substantial portion of the unlawful practices and violations of law alleged herein occurred and are occurring in the County of Los Angeles, California. Furthermore, Defendants regularly conduct business within the State of California, Los Angeles County, and Plaintiff resides in this judicial district.

## IV.   FACTUAL ALLEGATIONS

16. Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein.

17. On or about December 2021, Plaintiff wanted to buy his goddaughter a gift for the holidays, so he visited a Walmart Supercenter in the City of Industry, California, ("Walmart").

18. At Walmart, Plaintiff noticed Netspend Cards on display with the ability to load each card with amounts ranging from "$20.00 to $500.00" and an activation fee of approximately $2.95.

19. The display for the Netspend Cards advertised:

     a. "No credit check to get a card"

     b. "No minimum balance"

c.  "No fee for direct deposit"

d.  "Use for online shopping"

e.  "Shop in the USA virtually everywhere Visa® or Mastercard® Debit Cards are accepted"

20. The same display noted that "The Netspend Visa Prepaid Card is issued by Metabank [and that] Netspend . . . is a registered agent of Metabank."

21. Determining that the Netspend Cards to be a suitable gift that would have given his goddaughter the freedom to purchase whatever she wanted, Plaintiff decided to purchase five (5) Netspend Cards for a total of approximately $114.75.

22. At checkout, Plaintiff asked a Walmart store associate whether the Netspend Cards were ready for use upon purchase, as he was concerned about the service charge for each of the Netspend Cards.

23. In response to Plaintiff's question, the Walmart store associate indicated that the Netspend Cards would be ready for use upon activation.

24. However, the Netspend Cards that were received by Plaintiff's goddaughter were not what was bargained for by Plaintiff.

25. When one of the Netspend Cards was finally activated, after some difficulty, it was discovered that the balance on that card was significantly less than the $20.00 loaded onto it since it had an approximate balance of less than $9.00 upon activation.

26. Concerned as to why the balance on the Netspend Card was less than what was loaded onto it, the father of Plaintiff's goddaughter's attempted to access the account associated with the Netspend Card.

27. Since the father of Plaintiff's goddaughter was unable to access the account associated with the Netspend Card, he called Netspend customer service at (866) 387-7363 in early 2022. However, Netspend customer service was never able to remedy any of the problems that had been experienced with the Netspend Card.

28. Particularly, during that call, the father of Plaintiff's goddaughter navigated around various call options and attempted to connect with a live customer service representative, but he was never put in contact with anyone. In fact, the he was disconnected every time he selected the option to speak to a live customer service representative.

29. Thus far, neither Plaintiff nor the father of Plaintiff's goddaughter have been able to reach Netspend customer service to remedy the issues they have been experiencing with the Netspend Cards, nor have they been able to discern exactly why the balance on at least one of the Netspend Cards is less than the amount that was loaded onto it.

## V. CLASS ACTION ALLEGATIONS

30. Plaintiff and the members of the Class and Sub-Class have all suffered an injury in fact as a result of the Defendants' unlawful conduct.

31. Plaintiff brings this complaint on behalf of himself, and all others similarly situated under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3). The nationwide Class (the "Class") that Plaintiff seeks to represent is defined as follows:

> All persons within the United States who purchased or are the current owners of one or more Netspend Visa® Prepaid Debit Card(s) and i) received less than what was loaded onto the Netspend Visa® Prepaid Debit Card(s) upon activation; ii) were blocked from use of any portion of the funds on their Netspend Visa® Prepaid Debit Card(s); and/or experienced a substantial delay in activation of the Netspend Visa® Prepaid Debit Card(s) by Defendant/s.

32. In addition, Plaintiff seeks to represent the following California Sub-Class (the "Sub-Class") of which Plaintiff is a member:

> All persons within California who purchased or are the

current owners of one or more Netspend Visa® Prepaid Debit Card(s) and i) received less than what was loaded onto their Netspend Visa® Prepaid Debit Card(s) upon activation; ii) were blocked from use of any portion of the funds on the Netspend Visa® Prepaid Debit Card(s); and/or experienced a substantial delay in activation of the Netspend Visa® Prepaid Debit Card(s) by Defendant/s.

33. The Class and Sub-Class are collectively referred to as the "Classes."

34. Excluded from the Classes are Defendants' officers, directors, and employees; the judicial officers and associated court staff assigned to this case; and the immediate family members of such officers and staff.

35. *Numerosity*. The members of the Class and Sub-Class are so numerous that their individual joinder is impracticable. Netspend has established over 120,000 card distribution sites and approximately 130,000 card reload locations within the United States. Indeed, well over fifty (50) card distribution sites are located in or around the cities of Los Angeles, Costa mesa, and San Diego, California, alone.[6] In 2018, the FTC sent checks to more than 430,000 people because Netspend engaged in similar conduct alleged in this Complaint. In 2019, Netspend reported serving 10 million customers throughout the United States. Currently, Netspend's website states that Netspend serves an estimated 10 million consumers in the United States. Based on the elevated volume of Netspend cardholders, Plaintiff estimates that hundreds of thousands of Netspend customers were harmed by Defendants' present conduct within the United States.

36. *Existence and Predominance of Common Questions of Law and Fact*. Common questions of law and fact exist as to members of the Class and

[6] https://www.netspend.com/account/location-finder (last accessed Oct. 17, 2022) (when searching Netspend's locator database, Plaintiff's counsel was able to identify 19 "New Card" locations in Los Angeles, CA; 19 "New Card" locations in Costa Mesa, CA; and 21 "New Card" locations in San Diego, CA)

predominate over any questions affecting only individual Class Members. All members of the Class and Sub-Class have been subject to the same or substantially similar conduct and their claims are based on the widespread dissemination of the unlawful, deceptive, and unfair conduct by Defendants. The common legal and factual questions include, but are not limited to, the following:

A. The nature, scope, and operations of the wrongful practices of Defendants;

B. Whether Defendants negligently or intentionally failed to load the proper amounts on the Netspend Cards, blocked or delayed customers access to their funds from their Netspend Cards, or unreasonably delayed in activating the Netspend Cards;

C. Whether Defendants knew or should have known that their business practices were misleading, unfair and/or unlawful;

D. Whether Defendants actions or inactions violated the customer protection statutes invoked herein;

E. Whether Defendants' conduct with regards to advertising, selling or issuing the Pre-Paid Visa Credit Cards violated California law and/or public policy;

F. Whether Plaintiff and the Class members were damaged by Defendants' conduct and, if so, the appropriate amount of damages;

G. Whether, because of Defendants' misconduct, Plaintiff and the Classes are entitled to equitable and declaratory relief, and, if so, the nature of such relief; and

H. Whether Defendants were unjustly enriched by their unlawful and unfair business practices.

37. *Typicality*. The representative Plaintiff's claim are typical of the claims of the members of the Classes in that they were not able to receive the full benefits of

the Netspend Cards due to the wrongful practices of Defendant/s. Plaintiff's claims arise from the same practices and/or substantially similar course of conduct that give rise to the claims of the members of the Classes and are based on the same legal theories.

38. ***Adequacy of Representation***.  Plaintiff will fairly and adequately protect the interests of the members of the Classes. Plaintiff has retained counsel experienced in consumer protection law, including complex class action litigation.  Plaintiff has no adverse or antagonistic interests to those of the Classes and will fairly and adequately protect the interests of the Classes. Plaintiff's attorneys are aware of no interests adverse or antagonistic to those of Plaintiff and the proposed Classes.

39. ***Superiority***.  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  Individualized litigation would create the danger of inconsistent and/or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the courts and the issues raised by this action.

40. The damages or other financial detriment suffered by individual members of the Classes may be relatively small compared to the burden and expense that would be entailed by individual litigation of the claims against the Defendants.  The injury suffered by each individual member of the proposed Classes is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct.

41. It would be virtually impossible for members of the proposed Classes to individually redress effectively the wrongs to them without Court intervention. Even if the members of the proposed Classes could afford such litigation, the Court system could not.  Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case.

42. By contrast, the class action device used in conjunction with the Public Injunctive Relief sought as a Private Attorney General Action pursuant to Cal. Business and Professions Code § 17204 presents far fewer management difficulties, and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court. Therefore, a class action is maintainable pursuant to Fed. R. Civ. P. 23(b)(3).

43. Unless the Classes are certified, Defendants will continue their unlawful, unfair, and predatory practices as described herein. If the Classes are certified, the harms to the public and the Classes can be easily rectified.

44. Defendants have acted or refused to act on grounds that are generally applicable to the Classes so that declaratory and injunctive relief is appropriate to the Classes as a whole, making class certification appropriate pursuant to Fed R. Civ. P. 23(b)(2).

### FIRST CAUSE OF ACTION

**Violations of the California Consumer Legal Remedies Act**

**(Cal. Civ. Code § 1750, *et seq.*)**

**(On Behalf of Plaintiff and the California Sub-Class**

**against both Defendants)**

45. Plaintiff realleges and incorporates by reference all the above paragraphs of this First Amended Complaint as though fully stated herein.

46. Plaintiff brings this claim individually and on behalf of members of the proposed California Sub-Class.

47. The CLRA prohibits unfair or deceptive practices in connection with the sale of goods or services to a consumer.

48. The CLRA is meant to be "liberally construed and applies to promote its underlying purposes, which are to protect customers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." Cal. Civ. Code § 1760.

49. The CLRA defines "goods" as "tangible chattels bought or leased for use primarily for personal, family, or household purposes." Cal. Civ. Code § 1761(a).

50. The CLRA defines "services" as "work, labor, and services for other than a commercial or business use, including services furnished in connection with the sale or repair of goods." Cal. Civ. Code § 1761(b).

51. The Netspend's debit cards constitute either "goods" or services, or both, bought for use primarily for personal, family, or household purposes.

52. Defendants Netspend and Metabank are each a "person" as defined in Cal. Civ. Code § 1761(c).

53. Plaintiff and Class members are "consumers" who purchased or are the current owners of the Netspend Cards, and were denied access to or full use of Netspend Cards, which constitute goods or services for personal, family, or household purposes as defined by the CLRA. Cal. Civ. Code § 1761(d).

54. Each of the debit card purchases are "transactions" as defined by the CLRA. Cal. Civ. Code § 1761(e).

55. Defendants' actions, representations, and conduct have violated, and continue to violate the CLRA, because they extend to transactions that intended to result, or which have resulted in, the sale of goods or services to consumers.

56. Cal. Civ. Code § 1770(a)(5) prohibits representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another, and advertising goods or services with intent not to sell them as advertised.

57. Cal. Civ. Code § 1770(a)(9) prohibits advertising goods or services with the intent not to sell them as advertised.

58. Cal. Civ. Code § 1770(a)(14) prohibits representing that a transaction confers or

involves rights, remedies, or obligations that it does not have or involve.

59. By, at minimum, misrepresenting the funds that would be available on each Netspend Card upon activation, Defendants violated the CLRA.

60. For instance, Defendants represented that the value of at least one of the Netspend Cards purchased by GILBERT AMIS was $20.00. However, in actuality, that Netspend Card was only worth approximately less than $9.00. Therefore, Defendants represented that the Netspend Card was worth approximately $11.00 more than what it was actually worth upon activation.

61. Plaintiff suffered actual monetary damages as a direct and proximate result of Defendants' violations of the CLRA, as they expected at least one of the Netspend Cards to be worth $20.00, but instead, they received a Netspend Card worth approximately less than $9.00, and GILBERT AMIS paid a $2.95 activation fee.

62. Upon information and belief, Defendants' violations of the CLRA set forth herein were done with awareness of the fact that the conduct alleged was wrongful under California law and was motivated in substantial part by Defendants' self-interest, monetary gain, and increased profits.

63. Plaintiff further alleges that Defendants knew, or reasonably should have known, that harm was likely to result to Plaintiff. Defendants engaged in such unfair and deceptive conduct notwithstanding such knowledge.

64. Plaintiff suffered an "injury in fact," because Plaintiff's money was lost, as a direct and proximate result of Defendants' conduct alleged herein.

65. As a direct and proximate result of Defendants' violations of the CLRA's statutory sections alleged herein, Plaintiff is entitled to a declaratory judgment that Defendants violated the CLRA.

66. Filed concurrently with this Complaint as **Exhibit A** is a signed affidavit from Plaintiff, pursuant to Cal. Civ. Code § 1780(d).

67. In a letter dated September 15, 2022, Plaintiff, through counsel, served on Defendants and/or their agents, on or about September 19, 2022, a notice of alleged CLRA violations via certified mail, which asked Defendants to correct, repair, replace, or otherwise rectify the goods and services alleged to be in violation. This correspondence advised Defendants that such action must be taken within thirty (30) calendar days.

68. This cause of action is for injunctive relief only at this time, and Plaintiff reserves the right to amend the Complaint to assert actual, punitive, and statutory damages against Defendants pursuant to Cal. Civ. Code § 1782.

69. Plaintiff reserves the right to allege further conduct that constitutes other unfair business acts or practices. Such conduct is ongoing and continues to this date.

70. Plaintiff seeks public injunctive relief pursuant to Cal. Civ. Code § 1780, *et. seq.* ("CLRA") to benefit the general public directly by bringing an end to Defendants' unlawful business practices which threaten future injury to the general public.

**SECOND CAUSE OF ACTION**

**Violations of the California Unfair Competition Law**

**(Cal. Bus. & Prof. C. § 17200, *et. seq.*)**

**(On Behalf of Plaintiff and the California Sub-Class**

**against both Defendants)**

71. Plaintiff realleges and incorporates by reference all the above paragraphs of this First Amended Complaint as though fully stated herein.

72. The UCL defines "unfair business competition" to include any "unlawful, unfair, or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17200.

73. The UCL imposes strict liability. Plaintiff need not prove that Defendants intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices—but only that such practices occurred.

74. A business practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practices against the gravity of the harm to the alleged victims.

75. Defendants' actions constitute "unfair" business practices because, as alleged above, Defendants engaged in a misleading, deceptive and unfair practices of intentionally misrepresenting and/or omitting the fact from consumers that they would either have delayed, limited or no access at all to the funds in their Netspend Cards.

76. Further, consumers, such as GILBERT AMIS and members of the Sub-Class, paid Defendants an activation fee of approximately $2.95 to have access to the funds they loaded onto their Netspend Cards. Upon activation, consumers realized that they had less funds on their Netspend Cards than was loaded onto the Netspend Cards. The fact that Defendants charged an activation fee for Plaintiff and Sub-Class Members to utilize all of the funds loaded onto the Netspend Cards yet deprived Plaintiff and Sub-Class Members of all of the funds loaded onto their Netspend Cards is unfair in and of itself.

77. Notably, Netspend advertises their Netspend Cards as providing consumers with access to all of the funds they have loaded onto those cards, exclusive of the $2.95 activation fee. However, when it comes time for consumers to activate their Netspend Cards, they are often left with less than what was initially loaded onto those cards at purchase.

78. Through their practices, Defendants make or save millions of dollars which should have, in all fairness, been permanently credited to Plaintiff and the California Sub-Class.

79. Defendants' acts and practices offend an established public policy of transparency when it comes to advertising goods and services, and are immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

80. The harm to Plaintiff and Class Members grossly outweighs the utility of Defendant's practices as there is no utility to Defendants' practices.

### *"Fraudulent" Prong*

81. A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming general public.

82. Defendant's acts and practices alleged above constitute fraudulent business acts or practices as they deceived GILBERT AMIS and Sub-Class Members and are highly likely to deceive members of the consuming public.

83. As described with particularity above, Defendant Netspend represents to consumers, as an agent of MetaBank, that the amount loaded onto the Netspend Cards, not including the activation fee, is the amount that consumers would be able to withdraw from the Netspend Cards.

84. However, as demonstrated above, Sub-Class Members only had a fraction of the amount of funds loaded onto the Netspend Cards available to them and were unable to determine why that was the case since Defendants made it difficult for them to access the accounts associated with their respective Netspend Cards.

### *"Unlawful" Prong*

85. A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

86. Defendants' acts and practices alleged above constitute unlawful business acts or practices as they have violated the plain language of the CLRA, as described in Plaintiff's First Cause of Action.

87. The violation of any law constitutes an "unlawful" business practice under the UCL.

88. These acts and practices alleged were intended to or did result in violations of the CLRA.

89. Defendants' practices, as set forth above, have misled Plaintiff, the Sub-Class Members, and the public in the past and will continue to mislead them in the future. Consequently, the practices of Defendants constitute unfair and unlawful business practices within the meaning of the UCL.

90. Pursuant to the UCL, Plaintiff and the Sub-Class are entitled to preliminary and permanent injunctive relief and order Defendants to cease this unfair and unlawful competition, as well as disgorgement and restitution to Plaintiff and the Sub-Class of all the revenues associated with this unfair and unlawful competition, or such portion of said revenues as the Court may find applicable.

### THIRD CAUSE OF ACTION

**Unjust Enrichment**

**(On Behalf of Plaintiff, the Class and the California Sub-Class**

**against both Defendants)**

91. Plaintiff realleges and incorporates by reference all the above paragraphs of this First Amended Complaint as though fully stated herein.

92. Plaintiff brings this claim individually and on behalf of the members of the proposed Class and Sub-Class against Defendants.

93. "Under California law, the elements of unjust enrichment are: (a) receipt of a benefit; and (b) unjust retention of the benefit at the expense of another." *Valencia v. Volkswagen Grp. of Am. Inc.*, No. 15-CV-00887-HSG, 2015 WL 4747533, at *8 (N.D. Cal. Aug. 11, 2015). *See also Munoz v. MacMillan*, 195 Cal. App. 4th 648, 661 (2011) ("Common law principles of restitution require a party to return a benefit when the retention of such benefit would unjustly enrich

the recipient; a typical cause of action involving such remedy is 'quasi-contract.'")

94. "When a plaintiff alleges unjust enrichment, a court may construe the cause of action as a quasi-contract claim seeking restitution." *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015). "Whether termed unjust enrichment, quasi-contract, or quantum meruit, the equitable remedy of restitution when unjust enrichment has occurred 'is an obligation (not a true contract [citation]) created by the law without regard to the intention of the parties, and is designed to restore the aggrieved party to her or her former position by return of the thing or its equivalent in money.'" *F.D.I.C. v. Dintino*, 167 Cal. App. 4th 333, 346 (2008).

95. Plaintiff, the Class and Sub-Class members conferred non-gratuitous benefits upon Defendants through activation fees and loading funds onto Netspend Cards, that they were subsequently prevented from using as reasonably expected, whether or not they paid the money themselves or later become the owners of the Netspend Cards.

96. Defendants significantly and materially increased Defendants' revenues, profit margins, and profits by unjustly enriching Defendants at the expense and to the detriment of Plaintiff, the Class and Sub-Class members.

97. Defendants owe money to Plaintiff, the Class and Sub-Class for the improper conduct described herein. Specifically, Plaintiff, the Class and Sub-Class members either paid for one or more Netspend Cards to use anywhere MasterCard or Visa was accepted, or were provided with such cards for their own use.

98. However, by charging an activation fee and subsequently providing Plaintiff, Class and Sub-Class members with less than what was loaded onto the Netspend Cards (i.e., less than what was represented would be available on the Netspend Cards for Plaintiff, Class and Sub-Class members to use), Defendants retained

monies they were not otherwise entitled to, resulting in a benefit to Defendants by way of increased profits and detriment to Plaintiff, the Class and the Sub-Class members.  At the very least, the delay in providing Plaintiff, the Class and Sub-Class full access to all the funds loaded on the Netspend Cards unjustly enriched Defendants at the expense of Plaintiff, the Class and Sub-Class.

99.  Defendants are therefore indebted to Plaintiff, the Class and the Sub-Class in a sum certain, specifically the deed actually paid by the purchasers of the Netspend Cards.

100.  Further, Defendants are indebted to Plaintiff, the Class and Sub-Class in a sum certain for the additional money had and received by the Defendants, which the Defendants in equity and good conscience should not retain.

101.  Defendants are liable to Plaintiff, the Class and Sub-Class in the amount of unjust enrichment or money had and received to be determined at trial.

102.  Defendants' retention of any benefit collected directly and indirectly from the payments for use of the Netspend Cards offered by Defendants violates principles of justice, equity, and good conscience.

103.  Plaintiff, the Class and Sub-Class members are entitled to recover from Defendants all amounts that Defendants have wrongfully and improperly obtained, and Defendants should be required to disgorge to Plaintiff, the Class and the Sub-Class members the benefits that Defendants have unjustly retained.

104.  Defendants have retained such monetary benefits for their own financial gain. Thus, Defendants have been unjustly enriched in retaining the revenues and profits from the payments of Plaintiff, the Class and Sub-Class, which retention under these circumstances is unjust and inequitable.

105.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiff, the Class and Sub-Class members have suffered concrete harm and injury, including, but not limited to, monetary loss in connection with their purchases

of the goods or services pertaining to the Netspend Cards as well as the loss of funds that were loaded onto the Netspend Cards prior to activation.

106.   Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiff, the Class and Sub-Class would be unjust and inequitable.

107.   Plaintiff, the Class and Sub-Class members are entitled to seek disgorgement and restitution of wrongful profits, revenue, and benefits conferred upon Defendants in a manner established by this Court.

108.   Plaintiff, the Class and Sub-Class members request the Court enter an order awarding them restitution, rescission, and/or damages, and that they are entitled to recover their reasonable attorneys' fees.

109.   Plaintiff, the Class and Sub-Class members therefore also seek pre-and-post-judgment interest and attorneys' fees and costs as allowed by statute, including without limitation those recoverable under Cal. Code Civ. Proc. § 1021.5, any common law "private attorney general" equitable doctrine, any "common fund" doctrine, any "substantial benefit" doctrine, and/or any equitable principles of contribution and/or other methods of awarding attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, all other Class Members similarly situated, and the general public pray for judgment against Defendants, and each of them, as to each and every cause of action, and the following remedies:

- An Order declaring this action to be a proper class action, appointing Plaintiff as class representative, and appointing Plaintiff's attorneys as class counsel;
- An Order requiring Defendants to bear the cost of class notice(s);
- An Order awarding declaratory and other equitable relief, including recission, as necessary to protect the interest of Plaintiff and members of the Classes;

- An Order enjoining Defendants from engaging in the unfair, unlawful, and deceptive business practices complained herein, including through public injunctive relief;
- An Order requiring Defendants to pay all actual and statutory damages permitted under the causes of action alleged herein;
- An Order requiring Defendants to pay punitive and/or exemplary damages permitted under the causes of action alleged herein;
- An award of pre-and-post-judgment interest;
- An award of attorneys' fees and costs as allowed by statute, including without limitation those recoverable under Cal. Code Civ. Proc. § 1021.5, any common law "private attorney general" equitable doctrine, any "common fund" doctrine, any "substantial benefit" doctrine, and/or any equitable principles of contribution and/or other methods of awarding attorneys' fees and costs;
- An order requiring imposition of a constructive trust and/or disgorgement of Defendants' ill-gotten gains and to pay restitution to Plaintiff and all Class Members and, also, to restore to Plaintiff and members of the Classes all funds retained by means of any act or practice declared by this court to be an unlawful, fraudulent, or unfair business act or practice, in violation of laws, statutes or regulations, or constituting unfair competition;
- Distribution of any monies recovered on behalf of members of the Class via fluid recovery or *cy pres* recovery where necessary and as applicable, to prevent Defendants from retaining the benefits of their wrongful conduct;
- Costs of this suit; and
- Any other and further relief, including rescission, that the Court deems necessary, just, or proper.

//

## **DEMAND FOR JURY TRIAL**

Pursuant to the Seventh Amendment to the Constitution of the United States of America, Plaintiff is entitled to, and demand, a trial by jury on all issues triable by jury.

**KAZEROUNI LAW GROUP, APC**

Dated: October 18, 2022   By: /s/ Abbas Kazerounian
               Abbas Kazerounian, Esq.
               ak@kazlg.com
               *Attorneys for Plaintiff*